## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CYBER LITIGATION INC.,<br><br>　　　Debtor. | Chapter 11<br><br>Case No. 20-12702 (CTG) |
| DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>DDE PARTNERS, LLC<br><br>　　　Defendant. | Adv. Proc. No. 22-50439 (CTG)<br>**Related Docket Nos. 23, 24** |
| DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>FIFTYSIX INVESTMENTS LLC,<br><br>　　　Defendant. | Adv. Proc. No. 22-50441 (CTG)<br>**Related Docket Nos. 23, 24** |
| DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>JUSTIN LABEL and MILLENNIUM TRUST COMPANY, LLC,<br><br>　　　Defendants. | Adv. Proc. No. 22-50443 (CTG)<br>**Related Docket Nos. 23, 24** |

## MEMORANDUM OPINION

The debtor in this bankruptcy case was a cyber-fraud prevention company. Only a small fraction of the revenues reflected on the company's financial statements, however, was legitimate. Most of those revenues were wholly fictitious. The company's founder and CEO, Adam Rogas, fabricated business records showing those revenues for the purpose of defrauding investors.

The debtor filed for bankruptcy in October 2020 after the fraud was revealed. This case arises out of a tender offer made by the debtor five months before the bankruptcy filing. In that tender offer, the company used new investor funds to repurchase nearly $72 million worth of outstanding stock from existing shareholders, including both Rogas and the defendants. The plaintiff in this case, the trustee appointed to administer the debtor's litigation trust, seeks to recover payments made to the defendants in connection with that tender offer.

The crux of the plaintiff's complaint is that the tender offer was an exchange of the company's cash for shares in a company that was actually deeply insolvent and were thus worthless. The purpose of the transaction, plaintiff alleges, was to defraud the investors (who were the company's creditors). Accordingly, plaintiff seeks to avoid and recover payments made in connection with the tender offer as actual and constructive fraudulent conveyances, and to disallow defendants' claims under § 502(d) of the Bankruptcy Code unless and until any such fraudulent conveyances are repaid.[1] Plaintiff also maintains that the defendants would be unjustly enriched

---

[1] D.I. 21. Citations in this opinion to docket items refer to the docket for the adversary proceeding captioned *Drivetrain, LLC v. DDE Partners, LLC*, Bankr. D. Del. No. 22-50439.

if the money they received on account of worthless shares is not returned and seeks

recovery on that basis.

Defendants, however, assert that the plaintiff's claims fail as a matter of law

for several reasons.  Specifically, defendants argue that: (1) the payments made by

the debtor in connection with the tender offer are unavoidable because, under the

"earmarking doctrine," they were not transfers of estate property; (2) while Rogas

may have engaged in fraudulent conduct, the board of directors was the entity with

authority to decide to repurchase the shares, and a majority of the board members

lacked fraudulent intent; (3) § 546(e) of the Bankruptcy Code provides a safe harbor

that protects transactions made to or from financial institutions from claims of

constructive fraudulent conveyance; and (4) because the company was under a

contractual obligation to carry out the tender offer, a claim for unjust enrichment

cannot be used to supplant the express terms of that contract.  Both parties now move

for summary judgment.

For the reasons explained below, the Court will grant plaintiff's motion for

summary judgment on its actual fraudulent conveyance claim and deny defendants'

cross-motions.  The earmarking defense is unavailable because the funds used to

purchase the shares in the tender offer were the company's funds.  The debtor was

not legally obligated to use any particular amount of the proceeds of a prior issuance

---

The plaintiff filed substantially similar complaints in each of the above-captioned adversary
proceedings.  Briefing on each of the summary judgment motions was substantially the same.
This opinion is meant to resolve all three summary judgment motions.  The reference to the
*DDE Partners* docket is just for simplicity.

of new shares to buy back shares in the tender offer.  The earmarking doctrine therefore does not apply.

The innocence of various of the company's board members does not mean that intent to defraud may not be imputed to the debtor.  It is true that under Delaware law, which applies here, the intent of a transaction requiring board approval turns on the intent of a majority of the members of a company's board.  And it is true that here, a majority of the board was unaware of the fraud, having themselves been deceived by Rogas.  The question of imputation boils down to asking whether, notwithstanding the involvement of innocent board members, the debtor's decision to make the challenged transfers was still *caused* by Rogas' fraud.  To that end, the law has long recognized that when Person A controls Person B, Person A's intent may be imputed to Person B.  And there can be no stronger case for the application of that principle than where Person A tricked or deceived Person B into voting in favor of a transaction.  In such a case, the involvement of Person B is insufficient to break the causal chain between the person with fraudulent intent and the decision of the company.  Because it is undisputed that this is what happened here, Rogas' fraudulent intent can fairly be imputed to the company.

Because recovery on plaintiff's remaining claims for constructive fraudulent conveyance and unjust enrichment would be identical to the recovery to which the trustee is entitled on the actual fraudulent conveyance claim, those claims are effectively mooted by the Court's decision.  The Court therefore does not need to consider the availability of the safe harbor defense to the constructive fraudulent

conveyance claim or address the question whether unjust enrichment is available when the transaction is governed by a contract.

## Factual and Procedural Background

Adam Rogas co-founded NS8, Inc. in 2016.[2]  The company purported to be a fraud prevention service company that would help consumers avoid risks associated with online transactions.  In fact, the company generated only trivial revenues.[3]  The company was almost entirely a fraudulent scheme perpetrated by Rogas, who ultimately pled guilty to federal securities fraud charges and is now serving a prison sentence.  Significantly, at the summary judgment stage, the parties do not appear to dispute any of the actual historical facts about the underlying events.  Because the disagreement between the parties is limited to the legal significance of the undisputed facts, the case may be properly addressed on the parties' cross-motions for summary judgment.[4]

### 1.    The debtor's liquidity strains and fundraising efforts

The debtor never had meaningful customers or revenues.  From 2016 to 2020, the debtor generated less than $500,000 in revenue, while its operating expenses totaled roughly $13 million.[5]  Additionally, despite internal records to the contrary,

---

[2] NS8, Inc. is referred to herein as the "debtor."

[3] D.I. 24-4 ¶ 4.

[4] While both the defendant's motion (D.I. 23) and the plaintiff's opposition/cross-motion (D.I. 24) contain declarations and exhibits, neither asserts that a factual averment made by the opposing party is genuinely disputed, such that a trial would be required to resolve the parties' dispute.

[5] D.I. 24-4 ¶ 4.

the debtor appeared to have fewer than 30 customers in 2017.[6]  By any metric, the debtor would have been out of business shortly after its inception, but for the acts of Rogas, who served as the debtor's Chief Executive Officer and chaired the debtor's board of directors.

Rogas, in order to create the false appearance of a successful business, fabricated the debtor's bank statements, financial statements, and other corporate documents.  For example, in 2017, the debtor reported that it generated over $270,000 in revenue; in reality, that number was less than $25,000.[7]  Similarly, the debtor reported that it earned $8.5 million in revenue in 2018 despite the fact that throughout the company's existence, its annual revenue never exceeded $170,000.[8]  In an attempt to prevent others from uncovering his fraud, Rogas maintained exclusive control over the debtor's "financial and sales information despite having other executive finance and sale officers in place."[9]  Rogas also controlled the debtor's "revenue bank account, and the data and metrics underlying NS8's purported sales revenue and customer counts."[10]

Relying on falsified business records, Rogas secured capital by convincing outside investors to purchase stock in the debtor.  The first-day declaration in the main bankruptcy case, on which the trustee relies (without objection) in support of

---

[6] *Id.* ¶ 7.

[7] *Id.*

[8] *Id.*

[9] *Id.* ¶ 5.

[10] *Id.*

its summary judgment motion, explains that the debtor conducted several securities offerings to raise capital.  It raised $9 million from investors in the "seed rounds" in 2016 and 2017; $11 million in 2019 from the sale of convertible notes; and $123 million in 2019 and early 2020 through the sale of preferred shares, in what is described as the "Series A" round of financing.[11]  That financing was raised in two separate issuances: $50 million during the first issuance in September 2019 and $73 million during the second in April 2020.[12]

The lead investors in the Series A financing were funds managed by Edison Partners, AXA Partners, and Lightspeed Venture Partners.[13]  As a result of their investment of approximately $50 million in July 2019, each of those three lead investors had representatives who served on the debtor's board.  Collectively, they held a majority of the company's five board seats.  The other two seats were held by Rogas and Rick Gordon, who was Executive Vice President for Corporate Development.[14]

## 2.    The tender offer

The transaction that is the subject of this litigation, a tender offer under which the company purchased some of its own shares from various investors, took place in April 2020.  Before completing that tender offer, the company had to close on the

---

[11] Main Case D.I. 9 ¶ 14.

[12] D.I. 24-4 ¶ 10-11.  The two share purchase agreements, referred to as the "SPAs" are attached to the declaration of Timothy Daileader.  D.I. 24-4, Exs. A & B.

[13] D.I. 24-4 ¶16.  Edison Partners, AXA Partners, and Lightspeed Venture Partners are referred to collectively as the "SPA investors."

[14] D.I. 23-2 at 28 of 63.

second tranche of the Series A financing, bringing in approximately $73 million in cash from investors who bought shares of Series A-1 Preferred Stock at a price of $18.85 per share.[15]   The debtor then used those proceeds, in the tender offer, to purchase shares held by earlier investors, including the defendants in this litigation, as well as Rogas, who received $17 million in exchange for shares he held.[16]

During the course of negotiations that took place in connection with the April 2020 SPA, however, the debtor disclosed to the three board members who were appointed by the SPA investors that certain of the debtor's employees had received subpoenas from the SEC in connection with a 2019 whistleblower complaint.[17]   The board, in light of this development, elected to delay the 2020 SPA to permit an independent party to determine whether the debtor had engaged in any wrongdoing. To that end, the board retained Ernst & Young, an accounting firm; Kroll, a firm whose specialties include forensic investigation; and the law firm Crowell and Moring to investigate the whistleblower complaint.[18]   Each of these firms, apparently all deceived by Rogas' fabrications, reported no instances of fraud or wrongdoing. Satisfied with the firms' findings, the board decided to go forward with the 2020 SPA. On April 15, 2020, the board members formally approved the transaction following a presentation by Rogas, the substance of which was entirely false, "demonstrating

---

[15] D.I. 24-4, Ex. B, the April 2020 SPA § 1.1(b) (referred to as the "April 2020 SPA").

[16] *Id.* § 1.4.

[17] D.I. 24-4 ¶ 17.

[18] *Id.* ¶¶ 18-22.

NS8's growing revenues, customers, cash on hand, and overall financial performance."[19]

The debtor began repurchasing its outstanding stock shortly after closing on the April 2020 SPA. Indeed, the same day that the debtor's board of directors approved the April 2020 SPA, Rogas also updated the debtor's board members on the "various fundraising progress that the [debtor] made in Q1 2020, including formalization of details surrounding the [debtor]'s secondary transaction or tender offer."[20] In connection with that update, Rogas presented the debtor's financials for the first quarter of 2020 to the board, claiming that the debtor had revenues of nearly $7.1 million in March of 2020 and expected to reach $14.6 million in monthly revenue by the end of the year.[21] Rogas also informed the board members that the debtor's customer base had increased to over 11,100 customers across all six of the debtor's platforms.[22] Following these false statements, the board unanimously voted to approve the tender offer at the next board meeting, noting that the tender offer was "in the best interest of the [debtor] and its stockholders."[23]

Having obtained board approval, Rogas then proceeded to consummate the tender offer. On May 11, 2020, the debtor issued an "Offer to Purchase" to its shareholders, informing investors that, unless the debtor "exercise[d] [its]

---

[19] *Id.* ¶ 23.

[20] *Id.*, Ex. C. (Q-1 2020 Board Meeting Minutes).

[21] D.I. 24-4, Ex. D, at 178-180 of 239 (slide deck from Q-1 2020 Board Meeting).

[22] *Id.* at 184 of 239.

[23] D.I. 24-5, Ex. E, at 4 of 81 (April 15, 2020 Board Resolutions).

discretionary right to decide not to proceed with the repurchase," the debtor intended to "utilize certain of the proceeds from [the April 2020 SPA]" to purchase up to 3,884,420 shares from investors who wished to tender their shares.[24]  The offering price was $18.50 per share.[25]

The tender offer was oversubscribed.[26]  On June 23, 2020, the debtor funded the payments to the shareholders that participated in the tender offer.[27]  The debtor ultimately paid $72 million to purchase the shares, including $17 million that was paid to Rogas.  Each of the defendants in this adversary proceeding was a shareholder that sold shares to the debtor in the tender offer.  Because the valuation reflected in the purchase price was entirely a function of Rogas' fraud, the parties agree that the shares that the company purchased in the tender offer were, in truth, worthless.

### 3.    The bankruptcy filing

Shortly after the tender offer, Rogas' fraud began to unravel.  On September 1, 2020, following a request made to Rogas from the debtor's new president seeking access to the company's bank accounts, Rogas abruptly resigned as CEO.[28]  Rogas was arrested and charged with securities and wire fraud on September 17, 2020.[29]  On October 27, 2020, the debtor filed for bankruptcy.

---

[24] D.I. 24-5, Ex. G, at 22 of 81 (Offer to Purchase).

[25] *Id.*

[26] D.I. 24-4 ¶ 29.

[27] *Id.* ¶ 30.

[28] *Id.* ¶ 32.

[29] Main Case D.I. 9 ¶ 20.

The debtor confirmed its liquidating plan on April 13, 2022.[30]   That plan established the Cyber Litigation Trust, tasked with investigating and pursuing estate causes of action for the benefit of creditors.  The plaintiff in this case is Drivetrain, LLC, the trustee appointed to administer the Cyber Litigation Trust.[31]  On May 16, 2023, the plaintiff filed this amended complaint, seeking to recover the funds paid by the debtor in connection with the tender offer.[32]  Defendants DDE Partners, LLC, Fiftysix Investments LLC, Justin Label, and Millennium Trust Company, LLC were investors in the debtor who participated in the tender offer.  Collectively, the defendants received more than $2.2 million on account of their shares.  The plaintiff now seeks to recover these payments under theories of actual and constructive fraudulent conveyance and unjust enrichment, as well as disallowance of the claims filed by defendants against the bankruptcy estate.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the district court's standing order of reference.[33]  Although fraudulent conveyance suits are designated by statute as "core proceedings," the Supreme Court held in *Granfinanciera v. Nordberg* that a party's "right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2) seems … more accurately characterized as a private

---

[30] Main Case D.I. 747.

[31] Plaintiff Drivetrain, LLC is herein referred to as the "plaintiff."

[32] D.I 21.

[33] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

rather than a public right."[34]   And the Court in *Stern v. Marshall* held that bankruptcy courts may not enter final judgment on matters of private right, which is to say that as far as Article III goes, such matters may not be treated as core matters.[35]   Accordingly, it would appear that the Court would not be able to enter final judgment on the fraudulent conveyance claim absent the consent of both parties.[36]   Here, plaintiff consented to the entry of final judgment in accordance with Local Bankruptcy Rule 7008-1, but defendants have not.[37]

That issue, however, is overtaken by the fact that each of the defendants in this action has filed a proof of claim.[38]   Under § 502(d) of the Bankruptcy Code, a claim held by a recipient of an avoidable transfer should be disallowed.   *Katchen v. Landy* held that its predecessor provision in the Bankruptcy Act, § 57g, operated to transform the avoidance action into part of the claims allowance process, over which the referee in bankruptcy could exercise "summary jurisdiction."[39]   "[W]hen a bankruptcy trustee presents a [§ 57g] objection to a claim, the claim can neither be allowed nor disallowed until the preference matter is adjudicated.   The objection

---

[34] 492 U.S. 33, 55 (1989).

[35] 564 U.S. 462, 488 (2011).

[36] *In re Paragon Offshore PLC*, 598 B.R. 761 (Bankr. D. Del. 2019), correctly states that *Granfinanciera* itself was about whether a party had a Seventh Amendment right to a jury trial in a fraudulent conveyance case, not whether such a case could be decided by a non-Article III court.   But by so limiting *Granfinanciera* to its facts, the opinion arguably fails to engage the reasoning of *Granfinanciera* and *Stern.*   But as described herein, the Court has no occasion to resolve that matter in view of the fact that defendants' filed proofs of claim, which renders the dispute a core matter.

[37] *Compare* D.I. 1 ¶ 5 with D.I. 4 ¶ 5.

[38] *See* claim nos. 78, 79 and 80.

[39] 382 U.S. 323 (1966).

under [§ 57g] is, like other objections, part and parcel of the allowance process and is subject to summary adjudication by a bankruptcy court."[40]   The Supreme Court reaffirmed that point in *Stern*.  A consequence of filing a proof of claim is that "resolution of the preference issue" becomes "part of the process of allowing or disallowing claims, and accordingly there was no basis for the creditor to insist that the [preference] issue be resolved in an Article III court."[41]  This Court may therefore enter final judgment in this matter.

## Analysis

The cross-motions for summary judgment are brought under Civil Rule 56, as made applicable to this proceeding by Bankruptcy Rule 7056.  A party moving for summary judgment has the burden of showing "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[42] A fact is "material" if it would affect the outcome of the suit,[43] and a dispute is "genuine" if a reasonable factfinder could, based on the evidence presented, resolve the factual dispute in favor of the non-moving party.[44]  If, however, no reasonable jury

---

[40] *Id.* at 330.

[41] *Stern*, 564 U.S. at 496.  While the claim for unjust enrichment is a non-core matter on which the Court could not enter judgment, the Court's resolution of this case effectively moots that issue.  *See* Part III, *infra*.  It in any event bears note that, as the Supreme Court stated in *Executive Benefits v. Arkison*, 573 U.S. 25 (2014), in the context of a motion for summary judgment the issue of whether a bankruptcy court may enter a final judgment is a matter of relatively little consequence.  Regardless of whether a bankruptcy court issues a "judgment" or makes proposed findings and conclusions, a decision granting a motion for summary judgment is subject to the district court's *de novo* review in any event.  *Id.* at 39-49.

[42] Fed. R. Civ. P. 56(a).

[43] *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).

[44] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

could find for the non-moving party, then there is no "genuine issue for trial."[45]  Here, neither party contends that there is any genuine dispute as to a material fact.  Rather, on the record presented, both parties believe that they are entitled to judgment as a matter of law.

## I.   The transfers are not subject to the "earmarking" defense.

The plaintiff seeks to avoid the cash payments made by the debtor to the defendants, in exchange for the shares the debtor purchased, as fraudulent conveyances, invoking both §§ 544 and 548 of the Bankruptcy Code.  Under both provisions, a trustee (in this case, by virtue of the debtor's liquidating plan described above, the plaintiff) may only avoid the transfers if the property that was transferred belonged to the debtor at the time of the transfer.[46]  Stated differently, while the Bankruptcy Code allows a trustee to recover property that was fraudulently transferred out of the estate, fraudulent conveyance law cannot be used to recover funds that were never part of the estate.

One instance where a debtor lacks a sufficient interest in property to permit a transfer to be avoided is when the property is said to be "earmarked" for transfer to another party.  The "earmarking doctrine is entirely a court-made interpretation of the statutory requirement" that a party's avoidance powers be limited to transfers of

---

[45] *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968).

[46] *See,* 11 U.S.C. § 544(a) ("The trustee … may avoid any transfer of property of the debtor …"); 11 U.S.C. § 548(a) ("The trustee may avoid any transfer … of an interest of the debtor in property …").

the debtor's property.[47]  In essence, this doctrine states that when a party provides the debtor with funds and obligates the debtor to use those funds in a particular manner – typically to pay off an existing debt – those funds are said to be "earmarked" for that purpose.  The debtor's conveyance of those funds, in the manner required, is therefore not a transfer of the debtor's property.  The rationale is that these funds never became part of the debtor's estate.  In other words, when a debtor conveys earmarked funds from a third party to the required recipient, the debtor's estate was not altered in any meaningful way.  Where debt is refinanced by having the new creditor "take out" the prior creditor by advancing funds to the debtor that are used to pay down the earlier debt, the debtor remains indebted for the same amount.  Only the identity of the creditor has changed.[48]

Case law provides that in order for the earmarking doctrine to apply, the following requirements must be met:

> (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specific antecedent debt, (2)

---

[47] *In re Winstar Commc'ns., Inc.*, 554 F.3d 382, 400 (3d Cir. 2009) (internal quotations and citations omitted).

[48] *See Coral Petroleum v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986). Plaintiff argues that the earmarking doctrine should be limited to serving as a defense to a preference action, and that it should not apply in the context of a fraudulent conveyance. While it is true that the issue arises most often in the preference context, the analytic foundation of the doctrine, however, is that certain "earmarked" transfers are not, in fact, transfers of an interest of the debtor in property.  That statutory requirement, however, applies to fraudulent conveyance in the same way it does to a claim of preference. *Compare* 11 U.S.C. § 547(b) ("the trustee may avoid any transfer of an interest of the debtor in property…") *with* 11 U.S.C. § 548(a)(1) ("[t]he trustee may avoid any transfer … of an interest of the debtor in property….").  It is therefore hard to see why, if the elements of the doctrine were otherwise met, it would not apply to an alleged fraudulent conveyance in the same way it does to a preference.  Because, however, for the reasons described herein, the Court concludes that the requirements of the doctrine are not met in this case, the Court has no occasion here to resolve that issue definitively.

performance of that agreement according to its terms, and (3) the transaction viewed as a whole … does not result in any diminution of the [debtor's] estate.[49]

As one court explained, "[t]he central inquiry is whether the debtor had the right to disburse the funds to whomever it wished, or whether the disbursement was limited to a particular … creditor … under the agreement with the new creditor."[50] Where a debtor is, in essence, a conduit through which funds are transferred, then those funds cannot be said to have become a part of the bankruptcy estate.

Defendants here argue that the funds used by the debtor to repurchase outstanding shares were earmarked for that purpose and therefore never became part of the debtor's estate. Specifically, defendants highlight § 1.4 of the April 2020 SPA, where the debtor agreed to use certain of the SPA's proceeds to "purchase and redeem up to approximately 4,292,525 shares" in a subsequent tender offer.[51] Any remaining proceeds would be available for use by the debtor for "general corporate purposes."[52] Defendants maintain that this provision supports their contention that the $73 million raised in connection with the April 2020 SPA was earmarked for use in the tender offer. As additional evidence of earmarking, defendants note that the debtor did, in fact, use these funds to carry out the tender offer.[53] The plaintiff, for

---

[49] *Winstar*, 554 F. 3d at 400 (citing *In re Bohlen Enters., Ltd.*, 859 F.2d 561, 565 (8th Cir. 1988)).

[50] *In re AmeriServe Food Distrib., Inc.* 315 B.R. 24, 30 (Bankr. D. Del. 2004) (internal quotations and citations omitted).

[51] D.I. 24-4, Ex. B, § 1.4, at 90 of 239.

[52] *Id*.

[53] D.I. 23 at 22.

its part, concedes that the proceeds of the SPA were in fact used to repurchase shares in the tender offer, stating in its amended complaint that "[o]n or around June 23, 2020, [the debtor] distributed, from its bank accounts, over $72 million in exchange for the shares that it repurchased in the Tender Offer …"[54]

But for the earmarking doctrine to apply, it is necessary but not sufficient for the proceeds to be used in the manner directed by the party that provided the funds. The debtor must have been *legally obligated* to use the funds in that manner, rather than having the discretion to use them for other purposes. As described above, the first element of the earmarking doctrine is the existence of an agreement between the debtor and the new lender that commits the debtor to use the new funds for a specific purpose. If the debtor retains discretion to use the funds however it sees fit, then the funds are not earmarked.[55]

Defendants argue that § 1.4 of the April 2020 SPA clearly indicates that the debtor lacked discretion to use the SPA proceeds for any purpose other than to consummate the tender offer. That, however, is a misreading of the language of the agreement. The April 2020 SPA only required the debtor to use the proceeds to repurchase "*up to* approximately 4,292,525 shares of Common Stock."[56] Nothing in § 1.4, however, obligated the debtor to repurchase any minimum number of shares. That is, while § 1.4 set out a ceiling, it did not establish a floor. The debtor's purchase

---

[54] D.I. 21 ¶ 46.

[55] *See* 5 *Collier on Bankruptcy* ¶ 547.03 (16th ed. 2022) (observing that the earmarking doctrine will apply where "the debtor lacked dispositive control over the funds").

[56] D.I. 24-4, Ex. B, § 1.4, at 90 of 239 (emphasis added).

of one share would have complied with the terms of the SPA. And the agreement was clear that any proceeds beyond those used to repurchase shares "shall be used by the Company for general corporate purposes, in accordance with the directions of the Company's Board of Directors."[57]

The discretion the company had to determine how many shares to purchase, coupled with the express freedom the SPA gave to the company to use the balance of the proceeds "for general corporate purposes" means that the debtor effectively had the freedom to use the $73 million in proceeds from the SPA however it wanted. Here, it chose to use those proceeds to purchase shares held by the defendants. But there can be no serious suggestion it was required to do so. The result is that the cash that the debtor transferred to the defendants as part of the tender offer transaction was property of the debtor's estate. Defendants' earmarking defense is thus unsuccessful.

## II.   Rogas' actual fraudulent intent may be imputed to the debtor.

### A.   Rogas intended to hinder, delay, or defraud the debtor's creditors.

Counts I and II of plaintiff's amended complaint seek to recover the funds transferred by the debtor to the tender offer recipients as actual fraudulent transfers under both state and federal law. In order to prevail on these claims, the plaintiff must prove that the debtor made these transfers with actual intent to hinder, delay,

---

[57] *Id.*

or defraud its creditors.[58]  These requirements are disjunctive, such that "any one of the three requisite states of mind … is sufficient to establish the intent element."[59]

Here, no one disputes that Rogas' intent was to defraud the debtor's creditors. He raised substantial sums from investors based on financial statements that were wholly fabricated.  And having raised that money, he then transferred the value outside the reach of creditors by paying millions of dollars, as part of the tender offer, in exchange for shares that (as a result of his own fraud) he knew to be worthless. Rogas was himself a substantial beneficiary, receiving $17 million in the tender offer in exchange for his own shares.  Indeed, when asked at the hearing on the pending motions for summary judgment whether they disputed that Rogas actually intended to defraud creditors, counsel for the defendants acknowledged that they did not.[60]

The parties do dispute whether the defendants, who (like Rogas) participated in the tender offer and received cash in exchange for their shares had any culpability, in that they may have suspected or had reason to suspect Rogas' fraud.  For purposes of this motion, however, that dispute is beside the point.  The intent that matters for fraudulent conveyance law is that of the transferor.  A perfectly innocent transferee that receives a fraudulent conveyance is required to return the property conveyed (or the value thereof).  Accordingly, at least for the purposes of the instant motion, the intent of the defendants, as transferees, is of no moment.

---

[58] 11 U.S.C. §§ 544, 548(a)(1)(A); 6 *Del. C.* § 1304.

[59] *In re Syntax-Brillian Corp.*, No. 08-11407 (BLS), 2016 Bankr. LEXIS 988, at *13 (Bankr. D. Del. Feb. 8, 2016).

[60] August 30, 2023 Hr'g Tr. at 12.

**B.      Under the circumstances here, Rogas' intent may be imputed to the debtor.**

Having found that Rogas possessed the requisite fraudulent intent when he caused the debtor to enter into these transactions, the Court must determine whether that is sufficient to find that the company itself acted with fraudulent intent.  It is generally accepted that, in connection with a fraudulent conveyance claim, "[t]he only relevant intent is that of the debtor."[61]  Where the debtor is an individual, this analysis is straightforward; the individual's intent controls.  Where the debtor is a corporation or other legal entity, however, the enquiry becomes more nuanced.  Entities cannot themselves actually form an intent.  Rather, as an extension of the general principle that entities can only act through their officers, directors, or agents, an entity's intent is determined by imputing the intent of its agents.[62]

**1.      In construing a federal statute in which a defendant's mental state is an element, courts look to state law to determine when an agent's intent is imputed to a corporate defendant.**

The law in this circuit is that, in deciding whether to impute the intent of an individual to a corporation, federal courts should look to the law of imputation of the state under whose laws the entity is organized.  Courts have relied, in support of that conclusion, on the Supreme Court's decision in *O'Melveny & Myers*.[63]

In fairness, it is not intuitively obvious that a federal court should look to state law with respect to an element of a claim created by federal statute.  *O'Melveny* itself

---

[61] *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 300 (D. Del. 2012).

[62] *American Int'l Group, Consol. Derivative Litig.*, 976 A.2d 872, 893 (Del. Ch. 2009).

[63] *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83 (1994).

involved a cause of action created by state law.  The Court there rejected the argument that a special federal imputation rule should apply when the plaintiff is a federal agency, acting as receiver appointed under federal law.[64]  In that sense, *O'Melveny* could be viewed as being no different than the familiar *Butner* principle, under which the property of a bankruptcy estate (and therefore the rights of a federal bankruptcy trustee) are those held by the debtor under non-bankruptcy (typically state) law.[65]  The Third Circuit, however, has read *O'Melveny* more broadly than that, expressly holding that the principle applies equally where the claim at issue arises under federal law.[66]  That precedent is of course binding here.

### 2. The usual principle of imputation is that the intent of an agent, acting within the scope of the agent's authority, is imputed to the principal.

Turning then to Delaware state law, the Delaware Chancery Court has summarized the ordinary principles of imputation as follows: "A basic tenet of corporate law, derived from principles of agency law, is that knowledge and actions of the corporation's officers and directors, acting within the scope of their authority,

---

[64] *Id.*

[65] *See Butner v. United States*, 440 U.S. 48, 55 (1979).

[66] *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir. 2013) (noting that, in a case involving federal securities fraud case, while the cause of action is created by federal statute, "the issue of imputation is determined by state law."); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3d Cir. 2001) ("While bankruptcy law mandates that the trustee step into the shoes of the debtor when asserting causes of action, state law generally provides the substantive law governing imputation …").

are imputed to the corporation itself."[67]  This knowledge is imputed "even if the agent does not communicate [its] knowledge to the principal/employer."[68]

The "underlying reason," the Third Circuit explained, "is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business."[69]  Thus, in the fraudulent conveyance context, so long as a corporation's agent had the requisite fraudulent intent when it caused the corporation to carry out the transaction, that intent is imputed to the corporation.

### 3.   Under Delaware law, the intent of a majority of the board is controlling.

That principle, however, is subject to an exception when the action in question is one that cannot be decided and executed upon by any employee, but instead is a matter that was subject to the approval of the corporation's board of directors.  In such a case, it is the intent of the relevant decisionmaker – the majority of the members of the board of directors – that is imputed to the corporation.  Accordingly, the fact that one person involved in the decision might have acted with the intent to defraud creditors may not be a sufficient basis to conclude that the corporate decision was infected by that fraudulent intent.

---

[67] *Stewart v. Wilmington Trust SP Servs.*, 112 A.3d 271, 302-303 (Del. Ch. 2015).

[68] *Affordable Home Enters., Inc. v. Nelson,* No. 91C-08-024, 1994 WL 315227, at *3 (Del. Super. Ct. May 25, 1994).

[69] *In re Personal and Business Ins. Agency*, 334 F.3d 239, 242-243 (3d Cir. 2003) (internal citations and quotations omitted).

The Delaware Supreme Court recently addressed a closely related issue in *Boardwalk Pipeline Partners, LP v. Bandera Master Fund LP*.[70]  The punchline of the decision for current purposes is that where applicable law vests the authority to make a decision on behalf of a legal entity in a particular person or group of people, it is the intent of that person or group that should be imputed to the entity.  As applied to this case, the controlling intent is that of a majority of the debtor's board.

*Boardwalk Pipeline Partners* involved an oil and gas transport business, Boardwalk Pipeline Partners, LP, which was organized as a Delaware Master Limited Partnership, or MLP.  Its general partner, Boardwalk GP, LP (referred to as the "General Partner") exercised a call right that permitted the General Partner to take the MLP private, acquiring all public units at a price, set out in a formula contained in the partnership agreement.  The price was favorable to Loews (which indirectly controlled the General Partner, and itself held a majority of the units) and unfavorable to the public unitholders.[71]

The public unitholders filed suit, claiming that the General Partner had improperly exercised the call right.  The Court of Chancery agreed with the public unitholders and awarded almost $700 million in damages.[72]  But the Delaware Supreme Court reversed.

---

[70] 288 A.3d 1083 (Del. 2022).

[71] *Id.* at 1105.

[72] *Id.* at 1088.

The question of imputing intent arose because the partnership agreement broadly exculpated the General Partner for any action unless taken in bad faith. The agreement further provided that any action taken on reliance of advice of counsel would be conclusively deemed to have been taken in good faith.[73] An explanation of how the Delaware Supreme Court determined whose intent should be imputed to the corporation requires some understanding of the complex agreements at issue.

Under the terms of the agreement, the General Partner's call right was triggered by its receipt of an opinion of counsel, that the General Partner found acceptable, indicating that certain conditions were met (the conditions — which are not material for present purposes — had to do with whether the partnership's status as a pass-through entity for tax purpose would negatively affect the rates it was permitted to charge customers).[74] The right to decide (on behalf of the General Partner) whether an opinion was acceptable, the Supreme Court held, belonged to the sole member of the General Partner's general partner (referred to as the "Sole Member").[75]

After a D.C. Circuit decision led FERC to issue new regulations that arguably triggered the General Partner's call right, Loews sought to cause the General Partner to exercise it. It retained a law firm (Baker Botts) that issued an opinion indicating

---

[73] *Id.* at 1107.

[74] *Id.* at 1093.

[75] *Id.* at 1123.

that the conditions set forth in the partnership agreement for the exercise of the call right were satisfied.[76]

The question, however, was whether the General Partner should find that opinion to be acceptable. To resolve that question, the Sole Member retained a separate law firm (Skadden) which advised the Sole Member that it would be reasonable for it to rely on the Baker Botts opinion to conclude that the conditions had in fact been triggered. The Sole Member made that determination and directed the General Partner to exercise the call right, which it did.[77]

The lawsuit by the public unitholders sought damages for breach of the partnership agreement, claiming that the Baker Botts opinion did not qualify as an opinion because it was a contrived effort to reach a result desired by the General Partner. The Court of Chancery agreed.[78] In reversing the Court of Chancery, the Supreme Court accepted for purposes of its decision the Court of Chancery's factual determination that the Baker Botts opinion had been contrived at Loews' behest, and thus rendered in bad faith.[79] But it nevertheless found that the General Partner was exculpated from liability. The reason for that determination was that even if the Baker Botts' opinion was rendered in bad faith, its bad faith could not be imputed to the General Partner.[80]

---

[76] *Boardwalk Pipeline Partners*, 288 A.3d at 1087-1088.

[77] *Id.* at 1088-1089.

[78] *Id.* at 1107-1108.

[79] *Id.* at 1106, 1111-1112.

[80] *Id.* at 1122-1123.

Rather, the Supreme Court held, the only entity whose intent was relevant for this purpose was the Sole Member, which was the entity that, under the governing agreements (specifically, the LLC agreement for the entity that was the general partner of the General Partner) was entitled to determine whether an opinion rendered to the General Partner was acceptable. Because the Sole Member had validly relied on the Skadden opinion, and only the Sole Member's intent could properly be imputed to the General Partner, the General Partner should itself be deemed to have acted in good faith and thus be entitled to exculpation under the partnership agreement.[81]

> **4.     While, under *Boardwalk Pipeline Partners,* one would typically impute to the debtor the intent of a majority of its board, because Rogas deceived the board, his fraudulent intent is properly imputed to the debtor.**

Relying heavily on *Boardwalk Pipeline Partners*, defendants argue that a majority of the debtor's board was controlled by the SPA investors who were themselves victims of the fraud and thus presumably had no intent to defraud the company's creditors.  Rogas himself held only one seat on the board.  For that reason, defendants contend that Rogas' intent cannot be imputed to the debtor.  Indeed, defendants point further to the board members' reliance on reports from Ernst &

---

[81] *Id.* at 1114-1115, 1117-1118, 1123. *See also Dieckman v. Regency GP LP,* No. 11130-CB, 2021 WL 537325, at *36 (Del. Ch. Feb. 15, 2021) (because "it is the Board that governs and manages," the entity in question, the relevant intent was that of a majority of the board); *In re Elrod Holdings Corp.*, 421 B.R. 700, 712 (Bankr. D. Del. 2010) (the intent of two of the five board members cannot be imputed o the corporation).

Young and Crowell and Moring as supporting the absence of fraudulent intent among a majority of the debtor's board.

The question thus becomes whether the "cause" of the debtor's decision was, on the one hand, Rogas' fraud, or, on the other, the independent decision made by the innocent board members. And the obvious problem with defendants' position is that in the circumstances of this case, it makes no sense to treat the SPA investors as having had any intent with respect to the tender offer that is separate from Rogas' fraudulent scheme. The central point of *Boardwalk Pipeline Partners* is that the untainted Skadden opinion on which the Sole Member relied operated to break any causal chain that would have otherwise connected the Baker Botts opinion (that was found to have reflected bad faith) to the decision of the Sole Member.

In *Boardwalk Pipeline Partners*, the relevant decision maker was the Sole Member.[82] The court did not suggest that the Baker Botts opinion had been hermetically sealed from the Sole Member's consideration. To the contrary, the opinion explained that Skadden had shadowed the work conducted by Baker Botts on the opinion. The point, as this Court understands it, is that the Skadden opinion on which the Sole Member relied was at least sufficiently independent to sever the causal connection between the alleged bad faith and the ultimate decision to exercise the call right.[83]

---

[82] 288 A.3d at 1114.

[83] *Id.* at 1123.

By contrast, there is no such break in the causal chain here.  To the contrary,
it is undisputed that the Ernst & Young and Crowell and Moring opinions, and the
decisions of the SPA investors to support the tender offer, were nothing more than
manifestations of Rogas' fraudulent scheme.  There is no dispute, based on the record
in this case, that Ernst & Young and Crowell and Moring had themselves been tricked
by Rogas' fraud.  Those firms' opinions, and the votes of the SPA investors' designees
on the debtor's board, are nothing more than dominoes that fell along the way.  The
record, however, is clear that it was Rogas' fraud that set the chain in motion.  And
that fraud was apparently sufficiently convincing that it succeeded in overcoming the
efforts to bring independent judgment to bear on the board's decision.

This principle, that the presence of an intervening actor (such as a board
member) will be insufficient to break the causal connection between someone's
fraudulent intent and a corporate decision if the board member was "controlled" by
the fraudulent actor, is not a new one.  Judge Gerber of the bankruptcy court for the
Southern District of New York made this same point in his decision in *Lyondell*.
There, he explained that, under Delaware and Texas state law, an officer's wrongful
intent may be imputed to the corporation:

> by two means: (1) establishing the intent of a critical mass of Board
> members who might have that intent on their own, or (2) by establishing
> that [the officer] or another, by reason of the ability to control [the
> board], had caused the critical mass to form that intent.[84]

---

[84] *In re Lyondell Chem. Co.*, 541 B.R. 172, 177-178 (Bankr. S.D.N.Y. 2015).  Judge Gerber's
decision in *Lyondell* was ultimately reversed by the district court, which held that, as a
matter of Delaware law, the intent of the agent may be imputed to the principal.  *In re
Lyondell Chem. Co.*, 554 B.R. 635, 649 (S.D.N.Y. 2016).  But as described above in Part II.B.3,
in *Boardwalk Pipeline Partners*, the Delaware Supreme Court – whose construction of

The *Lyondell* opinion did not elaborate further on what it means for one actor to control another.  That case was before the court on a motion to dismiss, and the court found "the allegations … [to be] too thin to support [the] conclusion[] that [the actor with fraudulent intent] caused other Board members to join him in such a plan.  The fact that Board members typically voted in favor of [that board member's] recommendations does not, without quite a bit more, support the conclusion that he controlled them."[85]  On that basis, the court dismissed the intentional fraudulent conveyance counts.

More recently, the Court of Chancery observed that one party's control over another may provide a basis for imputing the intent of the controlling party to the one who was controlled.[86]  The issue in *Boomerang Tube* was whether a complaint adequately alleged, in a fraudulent conveyance case, that a transferor intended to hinder, delay or defraud creditors.  In a thoughtful opinion by Vice Chancellor Will, the court concluded that the allegations about the transferor's own intent were sufficient to survive a motion to dismiss, such that it did not need to resolve the question of imputation.  The court commented, however, that it was unpersuaded by the argument that one would need to pierce the corporate veil between two entities

---

Delaware law is of course authoritative – adopted Judge Gerber's (and rejected the district court's) reading of Delaware law, holding that where a particular body had the legal authority to make a particular corporate decision (there, the Sole Member on behalf of the General Partner and thus the MNP, here, the debtor's board), one must look to the intent of the individuals with legal authority to bind that body.

[85] *Lyondell*, 541 B.R. at 193.

[86] *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, No. 2022-0378-LWW, 2023 WL 5688392 (Del. Ch. Sept. 5, 2023).

to impute one's intent to another.  Rather, the court observed that for "a fraudulent conveyance claim, the actual fraudulent intent of an entity exercising control over a transferor may be imputed to the transferor."[87]

Additional light was shed on this issue in an opinion in the *Tribune* fraudulent conveyance litigation.[88]  That case was a fraudulent conveyance challenge to a leveraged buyout transaction.  The shareholder defendants moved to dismiss.  Applying Delaware law, the district court first determined that the relevant decisionmaker in that case (as in this case) was the company's board of directors.

There was no allegation that a majority of the company's board intended to commit fraud when it approved the transaction.  The plaintiff argued, however, that the company's management misled the firm that provided a solvency opinion before the transaction, including, for example, by manipulating the financial projections. The trustee further alleged that had the solvency opinion not been issued, the company's board would not have proceeded with the transaction.

Relying on Delaware caselaw that focused more on a board's exercise of its fiduciary duties than on the imputation of intent, the *Tribune* court explained that, in some contexts, Delaware "courts have indeed found management to 'control' an

---

[87] *Id.* at *12 (citing *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 817 F. Supp. 2d 934, 941 (N.D. Tex. 2011)).

[88] *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11-md-2296, 2017 U.S. Dist. LEXIS 3039, at *23 (S.D.N.Y. Jan. 6, 2017).

utterly passive board through deception."[89]  But on the allegations in the complaint before it, the court held that such "control" was inadequately pled.

A principal reason for that decision was the fact that, in *Tribune*, the company had received an independent solvency opinion from a third party prior to approving the leveraged buyout transaction.  Accordingly, the court found that the alleged acts of fraud (which may have tainted one of the opinions) were too attenuated from the board's ultimate decision to warrant imputing the officer's intent to the rest of the board.[90]

*Lyondell*, *Boomerang Tube*, and *Tribune* are thus consistent with this Court's reading of *Boardwalk Pipeline Partners*.  These cases can all fairly be read to stand for the proposition that when one is asked to determine whether an individual's intent should be imputed to a legal entity for the purpose of deciding whether someone's improper motive infected a corporate action, the touchstone of the analysis is ultimately a question of causation.

One must acknowledge that questions of causation are famously nuanced and complex, and often require a court engage in fine line-drawing between connections that are sufficiently direct and those that are too attenuated.  As the Supreme Court put it, principles of causation seek to discern whether there is "some direct relation

---

[89] *Id*. at **23-24 (citing *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989)).

[90] *Id*. at *29 (explaining that imputation was not warranted where it is premised on a theory that "depends on two successive levels of domination or influence.").

between the injury asserted and the injurious conduct alleged."[91]  There will certainly

be cases in which the line between a "direct" relationship and "remote" one may be

difficult to draw.[92]

But as this Court understands the most relevant caselaw, that is the question

that must be addressed to decide whether an individual's intent is properly imputed

to a corporate actor.  In *Boardwalk Pipeline Partners*, the Sole Member relied on the

Skadden opinion, such that the bad faith attributed to Baker Botts opinion was not

causally connected to the decision to exercise the call option.  *Lyondell* acknowledged

that one person's control over other board members could be a basis of finding that

the first person's intent can be attributed to the board as a whole.  But the *Lyondell*

court nevertheless dismissed the claim because it concluded that such control was not

sufficiently alleged.  *Boomerang Tube* similarly recognized control as basis for

imputation but had no occasion to decide the issue.  And *Tribune* found that deception

can be a means of exercising such control but found that the alleged deception was

still too remote to permit the imputation of fraudulent intent to the leveraged buyout

transaction.

In this case, however, the argument for control by means of deception, and thus

imputation, is exceptionally strong.  Indeed, while there will certainly be cases in

---

[91] *Holmes v. Secs. Inv. Protection Corp.*, 503 U.S. 258, 268-269 (1992) (citing 1 J. Sutherland, *Law of Damages* 55-56 (1882)).

[92] *See* W. Page Keeton, *et al., Prosser and Keeton on Torts* (5th ed. 1984) (observing that there "is perhaps nothing in the entire field of law which has called for more disagreement, or upon which the opinions are in such a welter of confusion" than the principle of proximate causation).

which it may be difficult to discern whether the causal connection between the actor's ill motive and the corporate action is sufficiently direct to permit imputation, this is not one of them. The line between Rogas' intent to defraud creditors and the debtor's decision to purchase its shares in the tender offer is as straight as an arrow. To be sure, other individuals, such as the three board members appointed by the SPA investors, voted in favor of the transaction. But the record is undisputed that they were "controlled" by Rogas in the sense that he deceived them into believing, by virtue of his fraud, that the transaction was fair to the debtor.

Unlike the other cases discussed above in which there was an explanation for why the corporate decision was made that was independent of the improper motive, no such explanation is available here. Rather, this record makes plain that the board's decision to approve the tender offer was the direct (and intended) result of Rogas' fraud. The undisputed facts show that, contrary to financial information Rogas provided to the board and investors, the company was deeply insolvent. Rogas was the sole person with access to the debtor's accounts. Because Rogas' fraud was the *sine qua non* of the tender offer, his intent to hinder, delay or defraud creditors is imputed to the debtor.[93]

---

[93] Defendants' argument, D.I. 23 at 3, that the actual reason for the transaction was the SPA investors' desire to increase their control of the debtor does not change the analysis, since any such desire on the part of the SPA investors is nothing more than another manifestation of Rogas' fraud.

**III.   In view of the foregoing, there is no need to address issues of constructive fraudulent conveyance or unjust enrichment.**

In addition to the claims for intentional fraudulent conveyance, the trustee also brings a claim for constructive fraudulent conveyance under state and federal law.  The trustee likewise seeks to recover the amounts paid on an unjust enrichment theory.  Defendants make various arguments in response, including the contention that the claim for constructive fraudulent conveyance fails because of the applicability of § 546(e)'s safe harbor, and that the claim for unjust enrichment is unavailable because the matter is the subject of the parties' contract.  Because these claims, however, seek to recover the same damages as the claim for actual fraudulent conveyance, it is unnecessary to consider them.

**IV.   Defendants' claims are disallowed under 11 U.S.C. § 502(d).**

Each of the defendants in this case has filed a proof of claim.  Section 502(d) of the Bankruptcy Code provides that those claims shall be disallowed unless and until any avoidable transfer that the defendants received is in fact returned to the bankruptcy estate.  The Court will therefore disallow those claims filed by the defendants in these lawsuits.

### Conclusion

For the foregoing reasons, the Court will enter summary judgment in favor of the plaintiff.  The Court will also disallow claim numbers 78, 79 and 80, under § 502(d), unless and until the avoided transfers are repaid to the estate.

The parties are directed to meet and confer and to submit under certification either agreed forms of judgment captioned in each of the three adversary proceedings,

34

or, if the parties cannot reach an agreement on the form of those judgments, competing forms of judgment.

Dated: October 19, 2023

_____

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE